*HHN*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

*FILED*

*AUG 5 2008*
*8 - 5 - 2008*
*JUDGE ELAINE E. BUCKLO*
*UNITED STATES DISTRICT COURT*

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| vs. | ) |
| | ) |
| JAMES ROBERT THOMAS | ) |

No. 08 CR 107-2
Judge Elaine F. Bucklo

## PLEA AGREEMENT

1.     This Plea Agreement between the United States Attorney for the Northern District of Illinois, PATRICK J. FITZGERALD, and defendant JAMES ROBERT THOMAS, and his attorney, LARRY BEAUMONT, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(C), Rule 11(c)(1)(A) and Rule 11(c)(1)(B), as more fully set forth below.   The parties to this Agreement have agreed upon the following:

### Charges in This Case

2.     The indictment in this case charges defendant with seven counts of wire fraud, in violation of Title 18, United States Code, Section 1343 (Counts 2, 3, 5, 6, 7, 11, 12) and one count of mail fraud, in violation of Title 18, United States Code, Section 1341 (Count 18).

3.     Defendant has read the charges against him contained in the indictment, and those charges have been fully explained to him by his attorney.

4.     Defendant fully understands the nature and elements of the crimes with which he has been charged.

## Charge to Which Defendant is Pleading Guilty

5.     By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to Count Two of the indictment.  Count Two charges defendant with devising, attempting to devise and participating in a scheme to use a wire in interstate commerce to obtain money and property owned by and under the custody of banks and lenders, by means of materially false and fraudulent pretenses, representations and promises, in violation of Title 18, United States Code, Section 1343.

## Factual Basis

6.     Defendant will plead guilty because he is in fact guilty of the charge contained in Count Two of the indictment.  In pleading guilty, defendant admits the following facts and that those facts establish his guilt and relevant conduct beyond a reasonable doubt:

Defendant JAMES ROBERT THOMAS admits that beginning in or about January 2003 and continuing through in or about November 2005, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, he, together with co-defendants Lawrence Skrobot, Varena McCloud, Charlene Batalla, Hattie Brooks, Donald Thomas, Jonathon Marchetti, Joseph Green III, Joseph Miller, Alfredo Hilado, Johnny White, Diane Robinson, John Lewis, James Green, Christopher Marchetti, Karl Allen, Alonzo Braziel, and Kevin Earl, and others, knowingly devised, attempted to devise, and participated in a scheme to defraud and to obtain money and property owned by and under the custody and control of banks and lenders, including, Argent Mortgage Company, Aames Funding Corporation (dba

2

Aames Home Loan), Chase Manhattan Mortgage Company, Fremont Investment and Loan, BNC Mortgage, Inc., People's Choice Home Loans, and other banks and lenders, by means of materially false and fraudulent pretenses, representations, and promises.

Defendant further admits that he and co-defendant Lawrence Skrobot recruited rehabbers Donald Thomas, Jonathon Marchetti, Joseph Green III and Christopher Marchetti, and other individuals to buy residences that would be financed by fraudulently obtained mortgage funds. Defendant was responsible for locating buyers and securing financing, and co-defendant Skrobot and other private lenders funded the costs associated with closing on the properties. Those costs included providing the money for buyers' down payments, verifications of deposit ("VODs"), and earnest payments. Skrobot also paid defendant when he needed to obtain false employment documents such as W-2 Wage and Tax Statements ("W-2s") and pay stubs, verifications of rent ("VORs"), building permits, appraisals and verifications of employment ("VOEs").

Defendant referred the buyers to co-defendants Varena McCloud and Charlene Batalla at Equity Express, and to co-defendant Joseph Miller at Company A, so that fraudulent mortgage loan applications could be prepared. In particular, from 2002 through 2005, defendant worked with McCloud to have buyers make false statements on loan applications to qualify them for mortgage loans. Defendant admits that early in his business relationship with McCloud, they discussed including false statements in the mortgage loan applications, and McCloud specifically told defendant what information should be included on buyers'

3

loan applications to qualify for a loan. After a while, defendant told McCloud to do whatever she had to do to best qualify the buyers he referred to her, regardless of whether it resulted in false statements on the loan applications. Defendant and McCloud agreed that McCloud would inform defendant when a buyer's income did not qualify for a loan, and when defendant needed to provide proof of additional income for the buyer. Defendant and co-defendant Skrobot paid McCloud a flat fee of approximately $3,500 for each mortgage loan she facilitated, minus the commission she earned from the lender.

Defendant admits he caused the preparation of mortgage loan application packages on behalf of buyers that were fraudulent in that they contained a variety of false statements designed to induce the lenders to issue mortgage loans to buyers who were not otherwise qualified for such loans. These false statements included false statements regarding the buyers' employment, income, assets and liabilities and intention to occupy the premises. In connection with some of the fraudulent transactions, defendant and co-defendant Skrobot issued false seller second mortgages and notes, purporting to lend the buyers funds to be applied toward the purchase of the properties, which funds were purportedly to be repaid, when in fact, defendant and the buyers had an agreement that the seller second mortgages would not be repaid in any part. Defendant and co-defendant Skrobot used false seller second mortgages to avoid limitations that mortgage lenders established as to the amount of money, credits or gifts that a property seller could provide to a property buyer.

4

Defendant also admits that he and his co-defendants created, and caused others to create, false W-2s, false earnings statements, false VOEs, false VORs and false leases to support the false statements in the loan applications regarding the buyers' employment and income; and false VODs to support the false representations in the loan applications regarding the amount of money and source of the deposits in the buyers' bank accounts. In particular, from 2002 through 2005, defendant purchased phony W-2s, pay stubs and VOEs from co-defendant Johnny White. White told defendant that he purchased some of the W-2s and pay stubs he sold to defendant from co-defendant Karl Allen. Defendant further admits that he purchased false W-2s, pay stubs and VOEs from co-defendants Diane Robinson and Donald Thomas. Defendant used the false documents he purchased to qualify buyers for properties and obtain money from lenders by false pretenses.    Defendant admits that he and co-defendant Joseph Green III agreed to submit false documentation for the purpose of qualifying co-defendant James Green for the purchase of five properties that he would otherwise not have been able to purchase. Defendant worked with co-defendants Diane Robinson, Joseph Green and Karl Allen to obtain false documents for James Green's purchases. Defendant admits that he did not disclose to the lenders that James Green qualified for loans based on the false paperwork, nor did he disclose the kickbacks and/or referral fees co-defendants Joseph Green and James Green received when the properties were purchased. James Green and Joseph Green received compensation for each property that James Green bought.

5

Defendant admits he accepted money from co-defendant Skrobot, and also used his own money, to purchase false VOR's, W-2s and pay stubs. Defendant also admits preparing, or submitting to lenders, false or misleading construction receipts to show that work was done to rehab certain properties.

Defendant further admits that some fraudulent mortgage loan packages submitted to lenders misrepresented that the buyers had paid rent for properties managed by a property management company called Ezra, Inc., when in fact that company did not manage the properties at issue, and the buyers did not rent property through it. Defendant admits purchasing false VORs from co-defendants McCloud and Batalla for $300 per VOR.

Defendant admits he and co-defendant Skrobot also purchased inflated or inaccurate property appraisals, which they submitted to loan officers to obtain loans. In particular, defendant admits that on several occasions, he paid appraisers to prepare an appraisal report that did not accurately reflect the true condition or value of the property being appraised, to take "creative" photographs that did not accurately reflect the condition of the rooms within the properties, or to add bedrooms to the report that were not in the residence.

Defendant further admits that he and co-defendants Lawrence Skrobot, Donald Thomas, Jonathon Marchetti and Christopher Marchetti received the proceeds of mortgage loans that lenders issued to buyers of the residences on or near the dates of their closings and used these loan proceeds to enrich themselves and to keep the scheme going by using the funds to buy and sell more property. Defendant also admits he borrowed funds to finance

6

his investments in the residences from various private lenders including co-defendant Skrobot and Individuals A, B and C. Defendant repaid these loans, plus interest in amounts ranging from 25% to 100%, with the sale proceeds from "flipping" property, i.e., purchasing property and immediately reselling it at an inflated price. On at least one occasion, defendant repaid Individual A by signing over the deed to a property he owned and had himself planned to flip.

Defendant admits he and his co-defendants concealed, misrepresented, and hid, and caused to be concealed, misrepresented, and hidden, the existence of the scheme, the purposes of the scheme, and the acts done in furtherance of the scheme.

Defendant admits that as a result of his fraudulent acts, various banks and lenders issued mortgage loans to the buyers of approximately 34 properties for an amount totaling approximately $2,861,750, and incurred losses on the mortgage loans because they were not repaid by the borrowers and because at least some of the properties were abandoned or in poor condition.

Defendant admits that on or about April 26, 2005, at Tinley Park, in the Northern District of Illinois, Eastern Division, and elsewhere, for the purpose of executing the above-described scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce, certain wirings, signs, and signals, namely, a funds transfer in the amount of approximately $72,250 from Deutsche Bank in New York, New York, to Bank One in Chicago, Illinois, for credit to the account of First American Title Insurance

7

Company, which funds transfer represented the proceeds of a mortgage loan issued to co-defendant James Green for the purchase of a residence located at 1418 Portland, Chicago Heights, Illinois, in violation of Title 18, United States Code, Sections 1343 and 2.

**Relevant Conduct**

Defendant admits he also did business with Individuals A and B, owners of R&P New Development, a real estate company he knows to have used similar practices to submit false information to induce lenders to fund the purchase of residences. Those practices included providing buyers with money to use for earnest money, VODs, and down payments, and paying buyers to purchase properties, to qualify buyers for loans to which they were not otherwise entitled. Defendant further admits he accepted a "finder's fee" to locate several properties for Individuals A and B, so they could flip them.

7. The foregoing facts are set forth solely to assist the court in determining whether a factual basis exists for defendant's plea of guilty, and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crimes and related conduct.

## Maximum Statutory Penalties

8. Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

a. A maximum sentence of 20 years' imprisonment. Pursuant to Title 18, United States Code, Section 3561. This offense also carries a maximum fine of $1,000,000,

8

or twice the gross gain or gross loss resulting from that offense, whichever is greater. Defendant further understands that the judge also may impose a term of supervised release of not more than five years.

b.      Defendant further understands that the Court must order restitution to the victims of the offense in an amount determined by the Court.

c.      In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which he has pled guilty, in addition to any other penalty or restitution imposed.

## Sentencing Guidelines Calculations

9.      Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines.  Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

10.     For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a.      **Applicable Guidelines**.  The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing.  The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2007 Guidelines Manual.

9

b. **Offense Level Calculations.**

i.    The base offense level for the charge in Count Two of the indictment is 7, pursuant to Guideline § 2B1.1(a)(1);

ii.    Pursuant to Guideline § 2B1.1(b)(1)(I), the base offense level is increased by sixteen levels because the loss is more than $1,000,000 but less than $2,500,000;

iii.    Defendant acknowledges the loss amounts, and therefore the offense level and Guidelines range, may increase as additional losses are realized from the fraudulent transactions in which defendant participated.

iv.    Pursuant to Guideline § 2B1.1(b)(9)(C), the base offense level is increased by two levels because the offense involved sophisticated means;

v.    Pursuant to Guideline § 3B1.1(a), the base offense level is increased by four levels because defendant was the leader or organizer of a criminal activity that involved five or more participants or was otherwise extensive;

vi.    Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline §3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested

10

financial information relevant to his ability to satisfy any fine or restitution that may be imposed in this case, a two-level reduction in the offense level is appropriate.

vii.    In accord with Guideline §3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline §3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

c.    **Criminal History Category.** With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government and stipulated below, defendant's criminal history points equal 1 and defendant's criminal history category is I: On or about August 19, 2002, defendant was convicted of violation of an unspecified statute in the Circuit Court of Cook County and sentenced to 6 months supervision. Pursuant to Guideline § 4A1.1(c), defendant receives one criminal history point for this conviction.

d.    Defendant and his attorney and the government acknowledge that the above Guideline calculations are preliminary in nature and based on facts known to the parties as of the time of this Plea Agreement. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts

11

and law relevant to sentencing, and that the Court's determinations govern the final Guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

e. Both parties expressly acknowledge that while none of the Guideline calculations set forth above are binding on the Court or the Probation Office, the parties have agreed pursuant to Fed.R.Crim.P. 11(c)(1)(B) that certain components of those calculations – specifically, those set forth above in subparagraphs 10(b)(i) and 10(b)(iii) through (vii) of this paragraph – are binding on the parties, and it shall be a breach of this Plea Agreement for either party to present or advocate a position inconsistent with the agreed calculations set forth in the identified subparagraphs.

f. Defendant understands that with the exception of the Guideline provisions identified above as binding on the parties, the Guideline calculations set forth above are non-binding predictions, upon which neither party is entitled to rely, and are not governed by Fed.R.Crim.P. 11(c)(1)(B). Errors in applying or interpreting any of the Sentencing Guidelines (other than those identified above as binding) may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the Guidelines. The validity of this Plea Agreement will not be

affected by such corrections, and defendant shall not have a right to withdraw his plea, nor

the government the right to vacate this Plea Agreement, on the basis of such corrections.

## Cooperation

11.    Defendant agrees he will fully and truthfully cooperate with the United States

Attorney for the Northern District of Illinois in any matter in which he is called upon to

cooperate. This cooperation shall include providing complete and truthful information in any

investigation and pre-trial preparation and complete and truthful testimony in any criminal,

civil or administrative proceeding. Only the United States Attorney for the Northern District

of Illinois may require defendant's cooperation pursuant to this Plea Agreement. Defendant

agrees to the postponement of his sentencing until after the conclusion of his cooperation.

## Agreements Relating to Sentencing

12.    At the time of sentencing, the government shall make known to the sentencing

judge the extent of defendant's cooperation. If the government determines that defendant has

continued to provide full and truthful cooperation as required by this plea agreement, then

the government shall move the Court, pursuant to Guideline §5K1.1, to depart from the

applicable Guideline range  and to impose the specific sentence agreed to by the parties as

outlined below.  Defendant understands that the decision to depart from the applicable

guidelines range rests solely with the Court.

13.    If the government moves the Court, pursuant to Sentencing Guideline §5K1.1,

to depart from the applicable Guideline range, as set forth in the preceding paragraph, this

13

Agreement will be governed, in part, by Federal Rule of Criminal Procedure 11(c)(1)(C).

That is, the parties have agreed that the sentence imposed by the Court shall include a term

of imprisonment in the custody of the Bureau of Prisons of 50 percent of the applicable

guideline range. Other than the agreed term of incarceration, the parties have agreed that the

Court remains free to impose the sentence it deems appropriate. If the Court accepts and

imposes the agreed term of incarceration set forth, defendant may not withdraw this plea as

a matter of right under Federal Rule of Criminal Procedure 11(d) and (e). If, however, the

Court refuses to impose the agreed term of incarceration set forth herein, thereby rejecting

this plea agreement, or otherwise refuses to accept defendant's plea of guilty, either party has

the right to withdraw from this plea agreement.

14.    If the government does not move the Court, pursuant to Sentencing Guideline

§5K1.1, to depart from the applicable Guideline range, as set forth above, this plea agreement

will not be governed, in any part, by Federal Rule of Criminal Procedure 11(c)(1)(C), the

preceding paragraph of this plea agreement will be inoperative, and the Court shall impose

a sentence taking into consideration the factors set forth in 18 U.S.C. § 3553(a) as well as the

Sentencing Guidelines without any downward departure for cooperation pursuant to §5K1.1.

Defendant may not withdraw his plea of guilty because the government has failed to make

a motion pursuant to Sentencing Guideline §5K1.1.

15.    Regarding restitution, the parties acknowledge that  pursuant to Title 18,

United States Code, § 3663A, the court must order defendant, together with any jointly liable

14

co-defendants, to make full restitution to Argent Mortgage Company, Aames Funding Corporation (dba Aames Home Loan), Chase Manhattan Mortgage Company, Fremont Investment and Loan, BNC Mortgage, Inc., People's Choice Home Loans, America One Acceptance Corp., and other banks and lenders, in an amount to be determined by the Court at sentencing, which amount shall reflect credit for any funds repaid prior to sentencing. Restitution shall be due immediately, and paid pursuant to a schedule to be set by the Court at sentencing.

16.    Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

17.    After sentence has been imposed on the counts to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the indictment and the forfeiture allegation as to this defendant.

### Presentence Investigation Report/Post-Sentence Supervision

18.    Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope and extent of defendant's conduct regarding the charges against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to the issue of sentencing, including the nature and extent of defendant's cooperation.

15

19.    Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline §3E1.1 and enhancement of his sentence for obstruction of justice under Guideline §3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

20.    For the purpose of monitoring defendant's compliance with his obligations to pay a fine and restitution during any term of supervised release to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release to which defendant is sentenced. Defendant also agrees that a certified copy of this Plea Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

16

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Plea Agreement

21.     This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 08 CR 107-2.

22.     This Plea Agreement concerns criminal liability only.  Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver or release by the United States or any of its agencies of any administrative or judicial civil claim, demand or cause of action it may have against defendant or any other person or entity.  The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

23.     Defendant understands that by pleading guilty he surrenders certain rights, including the following:

a.     **Trial rights.**  Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

i.     The trial could be either a jury trial or a trial by the judge sitting without a jury.  Defendant has a right to a jury trial.  However, in order that the trial be

17

conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

    ii.  If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

    iii.  If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt and that it was to consider each count of the indictment separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

    iv.  If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

    v.  At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would

18

be able to confront those government witnesses and his attorney would be able to cross-examine them.

      vi.    At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

      vii.    At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

      b.    **Waiver of appellate and collateral rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. Defendant is aware that Title 18, United States Code, Section 3742 affords a defendant the right to appeal his conviction and the sentence imposed. Acknowledging this, if the government makes a motion at sentencing for a downward departure pursuant to Sentencing Guideline § 5K1.1, defendant knowingly waives the right to appeal his conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, and including any order of restitution, in exchange for the concessions made by the United States in this Plea Agreement. In addition, defendant also waives his right to challenge his conviction and sentence, and the manner in

19

which the sentence was determined, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation.

c. Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

### Other Terms

24. Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine and restitution for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

25. Defendant understands that pursuant to Title 12, United States Code, Section 1829, his conviction in this case will prohibit him from directly or indirectly participating in the affairs of any financial institution insured by the Federal Deposit Insurance Corporation (FDIC) except with the prior written consent of the FDIC and, during the ten years following his conviction, the additional approval of this Court. Defendant further understands that if he violates this prohibition, he may be punished by imprisonment for up to five years and a fine of up to $1,000,000.

## Conclusion

26.    Defendant understands that this Plea Agreement will be filed with the Court, will become a matter of public record and may be disclosed to any person.

27.    Defendant understands that his compliance with each part of this Plea Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

28.    Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Plea Agreement to cause defendant to plead guilty.

29.    Defendant acknowledges that he has read this Plea Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: _August 5, 2008_

PATRICK J. FITZGERALD
United States Attorney

JAMES ROBERT THOMAS
Defendant

LISA NOLLER
MEGAN CHURCH
Assistant U.S. Attorneys

LARRY BEAUMONT
Attorney for Defendant